IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ASHLEY CREEK<br>PROPERTIES, LLC<br><br>   Plaintiff,<br><br> v.<br><br>LAWRENCE TIMCHAK, Supervisor<br>Caribou National Forest; JULIE<br>JACOBSON, Deputy Assistant,<br>Secretary of the Department of<br>Interior, Land and Minerals<br>Management; GAIL KIMBALL,<br>Chief, U.S. Forest Service; JIM<br>CASWELL, Director, Bureau of<br>Land Management; THOMAS J.<br>VILSACK,[1] Secretary of Agriculture;<br>and KENNETH L. SALAZAR,[2]<br>Secretary of Interior,<br><br>   Defendants, and<br><br>J.R. SIMPLOT COMPANY<br><br>   Intervenor-<br>   Defendant.<br>_____ | Case No. CV-08-0412-E-BLW<br><br><br>MEMORANDUM DECISION<br>AND ORDER |

---

  [1]  Thomas J. Vilsack is substituted for his predecessor as Secretary of Agriculture. Fed. R. Civ. Proc. 25(d).

  [2]  Kenneth L. Salazar is substituted for his predecessor as Secretary of the Interior. Fed. R. Civ. Proc. 25(d).

# INTRODUCTION

The Court has before it the federal defendants's motion to dismiss (Docket No. 11), intervener-defendant Simplot's motion to dismiss (Docket No. 10), and the federal defendants's motion to strike (Docket No. 26). Because the Court only granted Simplot's request for intervention as to remedy issues, the Court will not consider Simplot's motion. For the reasons set forth below, the Court will grant the federal defendants's motion to strike and their motion to dismiss.

# FACTUAL BACKGROUND

Ashley Creek Properties, LLC (Ashley Creek) challenges the expansion of Simplot's Smoky Canyon Mine located on federal land in southeast Idaho. Simplot sought approval from the Forest Service and the Bureau of Land Management (BLM) to expand the Smoky Canyon Mine in order to provide continued phosphate supply to its Pocatello fertilizer plant – the Don Plant. The federal defendants approved the expansion after completing an environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA) over objections by Ashley Creek and others that the mine would cause selenium pollution. 42 U.S.C. § 4332.

In a related case in this district, environmental groups are challenging the same federal action. *See* Case No. 4:08-cv-00388-MHW. There, Ashley Creek

**Memorandum Decision and Order – page 2**

attempted to participate as an amicus party at the preliminary injunction stage, but the Court rejected that attempt. *Greater Yellowstone Coalition v. Timchak*, 2008 WL 4911410, at *7 (D. Idaho, Nov 13, 2008). The Court denied the environmental group's request for a preliminary injunction, but the Circuit recently remanded that denial for reconsideration of an additional issue regarding the injunction and expedited briefing on the merits. *See Greater Yellowstone Coalition v. Timchak*, 2008 WL 5101754 (D. Idaho, November 26, 2008); *see also* Case No. 4:08-cv-00388-MHW, at Docket Nos. 104, 129.

In the present case, Ashley Creek sets forth a single claim – not included in the environmental groups's suit – that the federal defendants violated NEPA by failing to adequately consider sites in Vernal, Utah as an alternative source of phosphate. *Complaint* at ¶ 25. The complaint alleges that Ashley Creek's principle, John D. Archer, developed many phosphate leases in southeast Idaho and still retains an interest in many Simplot mining leases. *Id.* at ¶ 14. According to the complaint, Ashley Creek, or its principles and representatives, have frequently visited the area surrounding proposed expansion of the Smoky Canyon Mine and kept informed about local environmental matters. *Id.* They have also attempted to prevent selenium pollution by contributing to an environmental group and promoting use of Utah phosphate. *Id.* Ashley Creek seeks an order declaring the

**Memorandum Decision and Order – page 3**

EIS invalid and suspending approval of expansion of the Smoky Canyon Mine until completion of an adequate EIS.  *Id.* at ¶ 25.

The federal defendants filed a motion to dismiss (Docket No. 11) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on grounds of *stare decisis*, issue preclusion, and lack of Article III and prudential standing.  They analogize this case to a prior case where Ashley Creek lacked standing to challenge another phosphate mine in southeast Idaho.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939, 945 (9th Cir. 2005).[3]

In response, Ashley Creek filed the declaration of Elizabeth A. Williams (Docket No. 13).  Williams is John D. Archer's daughter.  *Declaration of Elizabeth A. Williams* (*Williams Declaration*) at ¶ 1.  She became manager of Ashley Creek and president of Ashley Creek's parent company, Archer Investments Inc., when John D. Archer died on September 1, 2008, just days prior to when Ashley Creek filed the complaint in this case.  *Id.* at ¶¶ 1-4.[4]  After obtaining several phosphate leases in southeast Idaho, John D. Archer and his wife, Elizabeth B. Archer,

---

[3]  Although "Ashley Creek Phosphate Co." was the plaintiff in the prior case and "Ashley Creek Properties, LLC" is the plaintiff in the present case, the parties appear to agree that it is the same entity for purposes of the motions at issue.

[4]  The *Williams Declaration* does not state the precise date of John D. Archer's death, but counsel for Ashley Creek provided the date at oral argument.

**Memorandum Decision and Order – page 4**

transferred them to Alumet Co. in 1974.  *Id.* at ¶¶ 5-6.  The Archers, however, retained interests in royalties on the leases.  *Id.* at ¶ 6, Exhibit A (addendum to the 1974 agreement transferring six federal and two non-federal leases).

In 1997, Alumet assigned its Idaho phosphate properties to Simplot.  *Id.* at ¶ 8.  A letter from Alumet to John D. Archer dated December 1997 confirms that the "sale preserves the requirement that Alumet keep track of all ore mined from the properties so that Alumet will pay to [John D. Archer] $0.50/ton on the second 20 million tons mined from the properties."  *Id.* at Exhibit D.  "The Alumet agreement remains in effect[,]" and the "Archer interests in the Alumet agreement and subject leases are presently held by Archer Investments Inc., parent of Ashley Creek[.]"  *Id.* at ¶ 9.

Williams alleges that John D. Archer believed, and she agrees, that selenium contamination was "reaching cumulative levels, . . . which not only threatened permanent damage to the environment, but would shortly forestall further development of Idaho reserves in which his entities owned an interest."  *Id.* at ¶ 18.  She also shares her father's belief that shifting development to the selenium-free Vernal fields could postpone Idaho development until safe technologies are developed and could produce income to clean up Idaho sites.  *Id.* at ¶ 19.

In reply, the federal defendants submitted a declaration asserting that the

**Memorandum Decision and Order – page 5**

BLM has no record of either Ashley Creek or Archer Investments possessing any interest in the six federal leases to which Williams referred.  *See Declaration of Jerry L. Taylor* (*Taylor Declaration*), Docket No. 23.  The BLM's records indicate that the BLM initially issued each of the six federal leases in 1969 or 1970 to either John D. Archer or Elizabeth B. Archer, and, most recently, the BLM approved reassignment of each federal lease from Alumet to Simplot during 1996 and 1997. *Id.* at ¶ 7, Exhibit 1.  BLM records state that Simplot's lease rights are subject to overriding royalty payments to Alumet of $0.50 per ton on five leases, and $0.20 per ton on one lease.  *Id.*  There is also a royalty payment of $0.025 per ton to the "Elizabeth Archer Eble Trust" for two of the six leases.  *Id.*

Finally, the BLM's records indicate that only one of the federal leases is located near the Smoky Canyon Mine.  *Id.* ¶ 8.  That lease – number I-015259 which is undeveloped and subject only to a royalty payment to Alumet in the amount of $0.20 per ton – is "considered to be a part of the Smoky Canyon Mine lease complex" only three to four miles north of the area of the proposed expansion.  *Id.* ¶¶ 7-8, Exhibit 2 (containing a map of federal leases); *Williams Declaration* at Exhibit B (containing a map of all eight federal and non-federal leases).

On March 31, 2009, the Court held oral argument on the motion to dismiss.

**Memorandum Decision and Order – page 6**

The next day, April 1, 2009, counsel for Ashley Creek mailed a letter to the Court supplementing its arguments. *See* Docket No. 27. The federal defendants promptly filed a motion to strike this letter (Docket No. 28).

The motion to dismiss and the motion to strike are now before the Court.

## ANALYSIS

### A.    The Motion to Strike

Ashley Creek's letter to the Court was an improper effort to supplement its arguments. "All matters to be called to a judge's attention should be formally submitted as . . . provided" by the Local Rules. D. Idaho R. 77.4. The letter may not have been an ex parte communication because counsel for Ashley Creek also mailed a copy to counsel for the federal defendants. Mailing the letter to the Court, however, was not in compliance with the Local Rules. *See id.* at 5.2 (format of documents filed), 7.1(c) (responding party entitled to file one brief not to exceed 20 pages). Ashley Creek mailed the letter to the Court, without seeking leave of the Court or communicating with the federal defendants beforehand. Thus, the Court will grant the motion to strike and will not consider Ashley Creek's letter.

### B.    Standing

#### 1.    Standard of review

Article III standing pertains to a federal court's subject-matter jurisdiction,

**Memorandum Decision and Order – page 7**

and it is properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *Id.* "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). On the other hand, "in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* Thus, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*

Here, the Court construes the federal defendants's jurisdictional attack as factual because both parties have submitted evidence to the jurisdictional issue. The Court will therefore weigh the evidence submitted.

### 2. Requirements for Article III standing

A plaintiff has the burden of establishing the three elements of Article III standing: (1) it has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury is fairly traceable to the challenged conduct; and (3) "it must be likely, as opposed to merely speculative, that the

**Memorandum Decision and Order – page 8**

injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and footnote omitted).

In cases involving procedural rights, such as the rights afforded by NEPA, an individual can establish standing "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8.

### a. Existing Circuit precedent to enforce procedural right.

Existing Circuit precedent establishes a relaxed standing requirement in cases involving procedural rights. *See, e.g., Covington v. Jefferson County*, 358 F.3d 626, 641 & n.21 (9th Cir. 2004); *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 & n.6 (9th Cir. 1995). That precedent relies on footnote 7 in *Lujan*, wherein the Supreme Court stated:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right *without meeting all the normal standards for redressability and immediacy*. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and *even though the dam will not be completed for many years*.

*Lujan*, 504 U.S. at 572 n.7 (emphasis added); *see also, e.g., Pacific Northwest*

**Memorandum Decision and Order – page 9**

*Generating Co-op. v. Brown*, 38 F.3d 1058, 1065 (9th Cir. 1994) (quoting footnote 7 of *Lujan*); *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.3 (9th Cir.2001) (same).

The Circuit has repeatedly held that plaintiffs enforcing a procedural right need not demonstrate the harm is imminent. *See Covington*, 358 F.3d at 641 n.21; *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1113 n.13 (9th Cir. 2002); *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir.2001); *Cantrell*, 241 F.3d at 679 n. 3; *Douglas County*, 48 F.3d at 1501 & n.6. Further, the Circuit has also held that plaintiffs need only establish causation in procedural rights cases "with reasonable probability," and "need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Kootenai Tribe of Idaho*, 313 F.3d at 1113 (internal quotation marks omitted).

For example, in *Kootenai Tribe of Idaho*, the Circuit held that the State of Idaho, Boise Cascade, and livestock companies each had standing to challenge the Forest Service's NEPA analysis of its Roadless Rule. *Id.* at 1112-13. They each had ownership interests in land next to the national forests and alleged that implementation of the Roadless Rule would lead to the spread of wildfire and destructive insects on their land. *Id.* There was, therefore, "a sufficient geographic nexus to the site of the challenged project" to establish a procedural injury. *Id.* at

**Memorandum Decision and Order – page 10**

1112 (internal quotation omitted). In response to the argument that the alleged harm was "speculative and not imminent," the Circuit held "[b]ecause the plaintiffs are alleging procedural violations, they need not show that the substantive economic harm is imminent." *Id.* at 1113 n.13 (internal quotation marks omitted); *accord Douglas County*, 48 F.3d at 1501 & n.6 (reaching same conclusion for counties challenging designation of critical habitat on land adjacent to theirs).

In contrast, Ashley Creek failed to establish a procedural injury in *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934 (9th Cir. 2005). Ashley Creek asserted that the BLM refused to include in an EIS the alternative that the proponent of the North Rasmussen Ridge Mine in southeast Idaho could mine phosphate in Vernal, Utah. Ashley Creek's Vernal deposits were 250 miles away from the challenged project. That distance "prevent[ed] an assumption, in [that] case, that Ashley Creek [was] geographically connected to North Rasmussen Ridge. Ashley Creek [had] not shown that its phosphate fields [were] tied to the location of the proposed mining or that the impacts of the mining [would] affect its property interests." *Ashley Creek Phosphate*, 420 F.3d at 938-39. Additionally, Ashley Creek did not allege "it use[d], appreciate[d], or in any way [had] an interest in the region surrounding North Rasmussen Ridge." *Id.* at 939. Ultimately, "the geographic disconnect between Ashley Creek and the proposed

**Memorandum Decision and Order – page 11**

mining project . . . preclude[d] Ashley Creek from alleging a procedural injury sufficient to confer standing." *Id.*

### b. Standing to enforce a procedural right after *Summers v. Earth Island Institute*

In *Summers v. Earth Island Institute*, 129 S.Ct. 1142 (2009), the Supreme Court implicitly overruled Circuit precedent in procedural rights cases. The plaintiffs in *Summers* alleged that Forest Service regulations limited their participation in the administrative decision making process in violation of the Forest Service Decisionmaking and Appeals Reform Act, 16 U.S.C. § 1612 note. *Summers*, 129 S.Ct. at 1148. They had initially challenged an individual logging project for which the regulations deprived them of such participation, but subsequently settled their claim on that project. *Id.* On appeal to the Circuit, the government argued that the plaintiffs had "suffered no cognizable injury in fact with respect to the challenged regulations, because the regulations ha[d] not yet been applied." *Earth Island Institute v. Ruthenbeck*, 490 F.3d 687, 693 (9th Cir. 2007), *as amended*. The Circuit held that plaintiffs still had standing to challenge the national regulations because they had both "personal and procedural injury." *Id.* at 694.[5]

---

[5] The Circuit went on to hold, however, that only the two provisions of the regulations applicable to the individual project were ripe for review. *Id.* at 696.

**Memorandum Decision and Order – page 12**

Reversing the Circuit, the Supreme Court held that the plaintiffs lacked Article III standing. *Summers*, 129 S.Ct. at 1150. With the individual project no longer in issue, the plaintiffs cited "no other application of the invalidated regulations that threaten[ed] imminent and concrete harm to the interests of their members." *Id*. One member's allegations of extensive past use of various National Forests and "plans to visit several unnamed National Forests in the future" did not suffice. *Id*. "There may be a chance, but is hardly a likelihood, that [the member's] wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations." *Id.* With regard to one National Forest subject to the regulations that the member "want[ed] to" go to, the Supreme Court held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 1151 (quoting *Lujan*, 504 U.S. at 564).

Emphasizing different language from footnote 7 in *Lujan* from that repeatedly relied upon by the Circuit, the Supreme Court then rejected the applicability of a lesser standard for procedural injuries. The Court held:

> [D]eprivation of a procedural right without some
> concrete interest that is affected by the deprivation – a
> procedural right in vacuo – is insufficient to create

**Memorandum Decision and Order – page 13**

> Article III standing. Only a "person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy."

*Summers*, 129 S.Ct. at 1151 (quoting *Lujan*, at 572 n.7) (emphasis in *Summers*). Further, "[i]t makes no difference that the procedural right has been accorded by Congress. That can loosen the strictures of the redressability prong of our standing inquiry . . . [but] the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.* The majority opinion in *Summers* went on to reject the dissent's reliance on *Los Angeles v. Lyons*, 461 U.S. 95, 107 n.7, 108 (1983). The majority refused to "replace the requirement of imminent harm . . . with the requirement of a realistic threat that reoccurrence of the challenged activity would cause harm in the reasonably near future." *Id.* at 1152-53 (internal quotations and alterations omitted).

     The Supreme Court therefore overruled the Ninth Circuit's standard allowing for a finding of procedural injury even when the harm is not "imminent." *See, e.g., Kootenai Tribe of Idaho*, 313 F.3d at 1113 n.13. A procedural injury must be imminent, and not merely part of vague, "some day" intentions to use an area that will suffer environmental harm. *Summers*, 129 S.Ct. at 1151. The *Summers* opinion did not, however, affect the Circuit's requirement that plaintiffs

**Memorandum Decision and Order – page 14**

establish a geographic nexus to the site of alleged harm. *See Ashley Creek Phosphate*, 420 F.3d at 938-39. Nor did it specifically overrule Circuit precedent regarding the relaxed standards for causation and redressability in cases of procedural injury. *See Kootenai Tribe of Idaho*, 313 F.3d at 1113.

### 3. Analysis

#### a. Recreational or aesthetic interest

The complaint alleges that Ashley Creek's "principal John D. Archer, and other of its representatives, were frequent visitors to the area surrounding Smoky Canyon Mine, and subscribers to local news sources to keep informed regarding environmental matters." *Complaint* at ¶ 14. This allegation is not specific as to any "representatives" other than John D. Archer, who passed away shortly before Ashley Creek filed its complaint. Further, there are no allegations or evidence that Ashley Creek's representatives plan to visit the area again in the near future. *See id.*; *Williams Declaration* at ¶ 20. In this factual challenge under Rule 12(b)(1), the Court concludes that Ashley Creek has not established a recreational or aesthetic interest in the area that will be imminently harmed. *See Summers*, 129 S.Ct. at 1151.

#### b. Economic interest

Ashley Creek's economic interests in this case are more geographically

**Memorandum Decision and Order – page 15**

connected to the site of the proposed mining than those asserted in *Ashley Creek Phosphate*. Here, Ashley Creek submitted evidence that its parent company has an interest in phosphate leases near the proposed mine. The December 1997 letter from Alumet to John D. Archer establishes that Alumet will pay the Archers $0.50 per ton for the second 20 million tons of phosphate mined, which would total $10 million. *See Williams Declaration* at Exhibit D. Among the eight leases at issue, one is a federal lease in the Smoky Canyon Mine complex within four miles of the proposed mine expansion. *See id.* at Exhibit A; *Taylor Declaration* at ¶¶ 7-8, Exhibit 2 (map). The geographic proximity of the alleged environmental harm is close to at least one of the sites from which Ashley Creek's potential economic interests arise.

Under the pre-*Summers* framework, the evidence may have established a sufficient procedural injury through the geographic nexus between Ashley Creek's possible income on mining leases and the alleged environmental harm at the Smoky Canyon Mine. The possibility, however, that Ashley Creek may some day be restricted from receiving income due to the environmental harm caused by expansion of the Smoky Canyon Mine simply is not imminent for two reasons.

First, it is far from likely that Ashley Creek will ever receive income from the Idaho leases at issue. Ashley Creek presented no allegations that Simplot plans

**Memorandum Decision and Order – page 16**

to mine any of the eight leases.  The Court is left guessing when, if ever, such development might occur.  The likelihood of royalty payments on the leases is therefore speculative at best.  Although Ashley Creek has argued the existence of a right of reversion, the only evidence of such a right in the record is a vague reference in the *Williams Declaration.  See Williams Declaration* at ¶ 6.  The December 1997 letter from Alumet to John D. Archer does not refer to a right of reversion.  *See id.* at Exhibit D.  Counsel for Ashley Creek represented at oral argument that the six federal leases will revert to Archer Investments if Simplot fails to pay the lease fee to the BLM.  Even assuming this is true, counsel conceded such reversion may not occur until over one-hundred years in the future, if ever.  Such "some day" expectations and remote, hypothetical possibilities do not establish an injury in fact.  *See Summers*, 129 S.Ct. at 1151.

     Second, there is no indication that the Forest Service will curtail phosphate mining in the future due to "cumulative levels" of selenium pollution.  For the six federal leases, the Forest Service or the BLM may have the authority to do so.  But the portions of the 2003 Revised Caribou National Forest Plan quoted by Ashley Creek in its brief do not contain a firm requirement to cut off mining activity at a given level of selenium pollution, and no other portions of that plan are in the record.  Indeed, the very approval of the mining expansion at issue cuts against

**Memorandum Decision and Order – page 17**

Ashley Creek's "cumulative level" theory. The Forest Service has approved that expansion even though, as Ashley Creek alleges, past phosphate mining has caused the area to be subject to the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). *See Complaint* at ¶ 10; *see also* Case No. 4:08-cv-00388-MHW, Docket Nos. 104 at pp. 6-7 (discussing the mine's status as a federal clean-up site). For the two non-federal leases, Ashley Creek has not even demonstrated that the Forest Service or the BLM has any authority to curtail future mining.

The Court must conclude that Ashley Creek fails the imminence requirement set forth in *Summers*. In sum, "[t]here may be a chance, but is hardly a likelihood," that selenium pollution at the Smoky Canyon Mine will trigger environmental restrictions that imminently injure Ashley Creek's ability to reap economic benefits from its future interests in nearby, undeveloped leases. *Summers*, 129 S.Ct. at 1150. The federal defendant's raised several additional reasons why they believe Ashley Creek lacks standing. The Court does not address those other bases, and rests its holding only on the speculative and "some day" nature of the alleged injury to Ashley Creek's economic interests.

   **c. Consolidation as a basis for standing**

Finally, Ashley Creek asserts that the standing question in this case is moot

because the environmental groups in the parallel suit have standing to challenge the mine expansion. According to Ashley Creek, it would not have to satisfy the standing requirements if the Court were to consolidate the two cases under Federal Rule of Civil Procedure 42.

The Court disagrees. Once a court determines that one of the plaintiffs in a suit has standing, it need not decide the standing of the others. *Natural Resources Defense Council v. U.S. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008). Here, however, there are two separate suits. Consolidation does not make those who are parties in one suit parties in another. *See Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n.1 (9th Cir. 1987) (holding that "consolidation of cases below did not 'make those who are parties in one suit parties in another'" for purposes of diversity jurisdiction inquiry (quoting *Johnson v. Manhattan Ry.*, 289 U.S. 479, 497 (1933)). Thus, consolidation cannot solve Ashley Creek's standing problem because Ashley Creek must be a party to the other suit to avail itself of the environmental groups's standing. Because Ashley Creek lacks standing, the Count must dismiss the complaint and cannot consolidate the actions.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the federal

**Memorandum Decision and Order – page 19**

defendants's motion to strike (Docket No. 26) and the federal defendants's motion to dismiss (Docket No. 11) are GRANTED.

IT IS FURTHER ORDERED, that the Court will not consider Simplot's motion to dismiss (Docket No. 10).

DATED:  **May 19, 2009**

*/s/ B. Lynn Winmill*
Honorable B. Lynn Winmill
Chief U. S. District Judge